Konrad L. Trope (California SBN: 133214)
TROPE AND TROPE LAW GROUP
415 North Camden Drive, Suite 111
Beverly Hills, California 90210
Phone: (818) 575-7423
Email: ktrope@tropeandtropelawgroup.com

Counsel for Plaintiff, Konrad Trope

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| KONRAD TROPE, a resident of the State of California,<br><br>                              Plaintiff,<br><br>        v.<br><br>ARTHUR DORLAG, a resident of the State of Florida; JADE REIMER, a resident of the State of Arizona; SHADY TREE STABLES, LLC, an Arizona limited liability company,<br><br><br>                              Defendants. | Case No: _____<br><br>**COMPLAINT FOR:**<br><br>(1) Fraud in the Inducement<br>(2) Fraudulent Concealment<br>(3) Fraudulent Misrepresentation<br>(4) Negligent Misrepresentation<br>(5) Breach of Fiduciary Duty<br>(6) Breach of Warranties of Merchantability and Fitness for a Particular Purpose<br>(7) Breach of Contract<br>(8) Breach of Covenant of Good Faith and Fair Dealing<br>(9) Declaratory Relief<br><br><br>**JURY DEMAND** |

   **COMES NOW**, Plaintiff KONRAD TROPE, a resident of the State of California, presents his complaint herein against Defendants ARTHUR DORLAG, a resident of the State of Florida, JADE REIMER, a resident of the State of Arizona, and SHADY TREE STABLES, LLC ("Shady Tree"), an Arizona limited liability company, and hereby alleges as follows:

1

## THE PARTIES

1.        Plaintiff Konrad Trope is an attorney and resident of the State of California.

2.        Defendant Arthur Dorlag is a resident of the State of Florida and was the seller of a horse named "C'est La Vie."  See sales contract between Plaintiff and Defendants, attached hereto as Exhibit 1.

3.        Defendant Jade Reimer is a resident of the State of Arizona and is a horse trainer.

4.        Defendant Shady Tree Stables, LLC, is an Arizona limited liability company, of which Jade Reimer is the sole member. John Reimer and Jade Reimer are co-managers of Shady Tree Stables, LLC.

## JURISDICTION AND VENUE

5.        This Court has jurisdiction pursuant to 28 U.S.C. § 1332 which mandates that the District Courts shall have diversity jurisdiction where the civil matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.        While the alleged contract at issue, attached as Exhibit 1 to this complaint ("the "Contract"), appears to have a forum selection clause declaring that the parties submit "to the personal jurisdiction of the courts sitting in Volusia County, FL," California courts have found that this language is merely permissive, not mandatory, and that exclusive language must be used for a forum selection clause to be mandatory. *Hansen v. Smoke Guard Cal., Inc.*, No. 23-cv-02038-RS, 2023 U.S. Dist. LEXIS 111666, at *6 (N.D. Cal. June 28, 2023); *Berg v. Mtc Elecs. Techs. Co.*, 61 Cal. App. 4th 349, 360, 71 Cal. Rptr. 2d 523, 529 (1998).

7.        Because the Contract contains no language mandating exclusive jurisdiction anywhere, venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2), because Plaintiff maintains his business in this judicial district, the events or omissions that give rise to the claims occurred in this judicial district, and

PLAINTIFF'S INITIAL COMPLAINT

all monies paid to Defendants from Plaintiff were due and payable in this judicial district.

**STATEMENTS OF FACTS**

8.      Plaintiff Konrad Trope ("Trope" or "Plaintiff") has a daughter named Raquel Trope ("Raquel" or "Plaintiff's daughter"), who is 24 years old. Raquel has competed in equestrian events since she was 11 years old.

9.      From August of 2020 through May of 2024, Plaintiff's daughter attended the University of Arizona in Tucson, Arizona.

10.      While Raquel was attending the University of Arizona, Raquel commenced equestrian show jumping training at Defendant Shady Tree Stables, an equestrian training business that rents equestrian facilities at Sonoran Stables in Tucson, Arizona.

11.      Raquel participated in equestrian training activities at Shady Tree under horse trainer Defendant Jade Reimer ("Reimer") starting in August of 2020. Defendant Reimer represented that she was very experienced with all forms of competitive equestrian events, and claimed to have majored in equine sciences while attending the University of Arizona.

12.      Plaintiff's daughter rode her own horse while training with Defendant Reimer, named "Mr. Cappuccino" ("Cappy").  Cappy was the first horse ever purchased by Plaintiff Trope.

13.      Plaintiff Trope purchased Cappy while Raquel was attending high school in Los Angeles, from Moonshine Equestrian in June 2019. Mr. Trope relied on the expertise of Erin Rossen, who owned Moonshine Equestrian, in purchasing Cappy. Ms. Rossen was training Raquel at the time.

14.      After approximately 6 months of Raquel training at Shady Tree Stables, in or about February of 2021, Defendant Reimer approached Plaintiff's daughter and then Plaintiff Trope, claiming that Cappy had reached his limit in show jumping competitions.

PLAINTIFF'S INITIAL COMPLAINT

15.    Reimer stated that if Plaintiff's daughter wanted to progress and jump any higher or further her equestrian abilities, she would need to find a younger, more robust horse. Reimer offered to help Mr. Trope find a new horse.

16.    Plaintiff Trope asked Defendant Reimer if she was absolutely certain that Cappy would not be able to remain Plaintiff's daughter's horse in equestrian competitions and Reimer stated unequivocally that she was certain Cappy was not sufficient and that a new horse would be needed if Plaintiff's daughter wanted to progress in her skills at competing in horse jumping competitions.

17.    In or around April or May of 2021, Plaintiff Trope asked Reimer to search for a new horse for Plaintiff's daughter to use in equestrian competitions.

18.    Defendant Reimer explained that Mr. Trope would be responsible for the purchase price, as well as a 10% commission fee to Reimer, transportation fees, and a veterinarian fee for a veterinarian to examine a potential horse Mr. Trope would want to purchase.

19.    Reimer initially presented some horses that were over $100,000, of which Mr. Trope communicated were out of his budget.

20.    In June of 2021, Reimer found a horse in Florida named "C'est La Vie," nicknamed "Finley," which she claimed had been trained and had competed in Europe and would be a perfect horse for Plaintiff's daughter's equestrian aspirations.

21.    Defendant Reimer sent Mr. Trope multiple videos of Finley.  Reimer said the videos showed him as a quality horse and assured Plaintiff Trope that Finley was a perfect horse to purchase.

22.    Mr. Trope paid around $3,000 for a veterinarian in Florida to examine Finley and Finley's prior veterinarian records. To assure Plaintiff Trope that this veterinarian's assessment was accurate, Reimer had another veterinarian in Tucson examine Finley's medical records, which again cost Plaintiff Trope around $3,000.

23.    Defendant Reimer told Plaintiff Trope that Finley's seller, Defendant

PLAINTIFF'S INITIAL COMPLAINT

Arthur Dorlag, had told Reimer that Finley was an excellent horse for show jumping competitions. Defendant Reimer also explained that she was acting as an agent of Defendant Dorlag because Dorlag would pay Reimer 10% of the purchase price received by Dorlag, just as she was receiving 10% of the purchase price from Mr. Trope.

24.     Based on these representations made to him, on July 1, 2021, Plaintiff Trope entered into the Contract, attached here as Exhibit 1, with Defendant Dorlag to purchase Finley for $50,000.

25.     It was agreed that Mr. Trope would pay an additional 10% of the purchase price as commission to Defendant Reimer as well as approximately $2,000 in transportation costs to bring Finley to Shady Tree Stables in Tucson.

26.     Plaintiff is informed and believes and thereon alleges that Defendant Reimer also received an additional 10% of the purchase price from Defendant Dorlag.

27.     Immediately upon Finley's arrival in Tucson, Plaintiff's daughter began riding Finley. Within a few weeks, Raquel experienced multiple incidents of Finley getting "spooked" and bucking Raquel off, once resulting in Raquel sustaining a concussion.

28.     Finley showed signs of being susceptible to "spinning," in which he would get "spooked" by reacting to objects in his periphery and would buck or spin.

29.     Finley was particularly anxious when around other horses at competitions or when there was movement in his periphery. Finley also bucked even in ordinary circumstances such as Raquel reaching sideways for a water bottle while riding him.

30.     Over the next 18 months, Raquel and Finley enrolled in several horse shows in Arizona and California. In several show competitions, Finley would either come up lame (have an abnormal gait) or would not follow Raquel's

PLAINTIFF'S INITIAL COMPLAINT

instructions while riding and Raquel was therefore disqualified repeatedly after each incident.

31.     During these incidents, Defendant Reimer stated to Raquel that the fault lay with Raquel, not Finley, but that Reimer would work with Finley to resolve his "spinning."

32.     Defendant Reimer did not inform Plaintiff Trope about Finley's spinning.

33.     Plaintiff's daughter graduated from the University of Arizona in May 2023. She moved back to California with both Finley and Cappy in January 2024.

34.     In January of 2024, Finley was brought to Cerulean Farms in Bell Canyon, California and Raquel attempted to ride Finley under the guidance of horse trainers Lisa Winn and Jessica Rabbiner.

35.     At Cerulean Farms, Finley's spinning became more pronounced and both Rabbiner and Winn determined that Finley was unsafe for Plaintiff's daughter to ride.

36.     Rabbiner and Winn stated that Finley's defects were clearly observable to any expert in show jumping. Rabbiner and Winn opined that Finley had suffered some trauma prior to his purchase in July of 2021 that caused him to "spin" unexpectedly.

37.     Winn and Rabbiner informed Plaintiff Trope of Finley's spinning, about which Defendant Reimer had never communicated to Plaintiff.

38.     Winn and Rabbiner called Defendant Reimer in April of 2024 about Finley's spinning. Reimer stated that she had tried to work on Finley's spinning but provided no further details.

39.     Winn and Rabbiner have since both reached out to Defendant Reimer asking for more information, to which Reimer has not responded.

40.     Other more experienced riders have attempted to ride Finley and found the same difficulty Raquel experienced. One expert rider was bucked and dragged

PLAINTIFF'S INITIAL COMPLAINT

1  through the bushes.

2  41.   During the summer of 2024, Mr. Trope paid for and enrolled Finley in

3  de-sensitizing training, but Finley showed no improvement.

4  42.   Finley was then sent to a horse specialist, Alan Clark, in Temecula,

5  California, who determined that Finley was not appropriate for Raquel to use in

6  equestrian competitions.

7  43.   Thus, since April of 2024, Finley has no longer been ridden by

8  Plaintiff's daughter, who instead returned to riding Cappy. With Cappy, Raquel

9  has won many ribbons and has jumped even higher in her competitions than she

10  previously had with Cappy while in Arizona, progressing farther than Defendant

11  Reimer had ever said was possible.

12  44.   In April of 2025, Plaintiff Trope sold Finley for $1.00 with full and

13  complete disclosures of all of Finley's deficiencies.

14  45.   During the approximately 45 months of owning Finley, Plaintiff Trope

15  paid around $3,400 per month for boarding, shoeing, and veterinarian exams for

16  Finley, totaling in excess of $150,000. In addition, Mr. Trope paid for Finley to

17  appear in at least four horse shows which cost about $4,000–$5,000 each,

18  including transportation, only for Finley to be disqualified in at least two of the

19  shows due to his spinning, costing Mr. Trope at least $16,000 for the four shows.

20  Mr. Trope paid $50,000 for the purchase of Finley and an additional $5,000

21  commission fee to Defendant Reimer. At a minimum, these damages exceed

22  $250,000.

23  **FIRST CLAIM FOR RELIEF[1]**

24  (Fraud in the Inducement of a Contract)

25  AS AND FOR A FIRST CLAIM FOR RELIEF FOR FRAUD IN THE

26
27
28
---
[1] Because Plaintiff is challenging the validity of the Contract and seeks the entire Contract be declared void, and until it is determined whether the alleged Contract or parts of it are considered void, Plaintiff seeks to use California law. Alternatively, if the Contract is found to be valid, Florida law will be used in accordance with the choice of law clause; however, there is little difference between the standard of pleading these tort claims under Florida or California law.

PLAINTIFF'S INITIAL COMPLAINT

INDUCEMENT AGAINST ALL DEFENDANTS, PLAINTIFF ALLEGES:

46.     Plaintiff realleges and incorporates herein by reference Paragraphs 1 through 45 inclusive of Plaintiff's Complaint herein above with the same force and effect as though set forth in full herein below.

47.     Defendants Dorlag and Reimer are equestrian professionals engaged in the business of buying, selling, and training horses. Mr. Trope is a novice in equestrian matters, having only purchased one horse previously for which he hired a trainer to help purchase, and lacks equestrian expertise.

48.     Plaintiff informed Defendants that he was seeking a horse suitable for equestrian use. In the course of negotiations, Dorlag and Reimer represented to Mr. Trope that the horse named Finley was a horse fit for use in equestrian events.

49.     In fact, Defendants knew that Finley was not fit for competitive horse show jumping. Specifically, Defendants knew that Finley was easily "spooked" and not safe to ride.

50.     Defendants made these misrepresentations knowingly and with the intent to induce Plaintiff Trope to rely on them and enter into the Contract to purchase Finley.

51.     Plaintiff Trope reasonably relied on these representations regarding Finley's suitability for equestrian use, considering Defendants' superior knowledge and expertise and Mr. Trope's inexperience.

52.     As a direct result of Defendants' fraudulent inducement, Mr. Trope purchased Finley, causing Mr. Trope to suffer damages in excess of $250,000, as Plaintiff Trope never would have purchased Finley but for the false statements made by Defendants.

53.     Because Defendants' conduct is so outrageous, done with malicious intent, and this type of conduct needs to be deterred in the future, punitive damages of no less than three times Plaintiff's actual damages should also be awarded, in the sum of not less than $750,000. Plaintiff also asks that the alleged Contract be

PLAINTIFF'S INITIAL COMPLAINT

declared void for fraud in the inducement.

## SECOND CLAIM FOR RELIEF

(Fraudulent Concealment)

AS AND FOR A SECOND CLAIM FOR RELIEF FOR FRAUDULENT CONCEALMENT AGAINST ALL DEFENDANTS, PLAINTIFF ALLEGES:

54.   Plaintiff realleges and incorporates by reference paragraphs 1 through 53 inclusive of Plaintiff's Complaint herein above with the same force and affect as those set forth in full herein below.

55.   Under both Florida and California law, there is a duty to disclose in business transactions when one party has superior knowledge of material facts or when there is partial disclosure of relevant facts. *Henson v. James M. Barker Co.*, 555 So. 2d 901, 908 (Fla. Dist. Ct. App. 1990); *Gresh v. Waste Servs. of Am., Inc.*, 311 F. App'x 766, 772 (6th Cir. 2009); *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1094 (N.D. Cal. 2007); *Wadeea v. Mercedes-Benz USA, LLC*, 758 F. Supp. 3d 1217, 1225-26 (S.D. Cal. 2024).

56.   Defendants had a duty to disclose in this case because Defendants are equestrian professionals engaged in the business of buying, selling, and training horses. Mr. Trope is a novice in equestrian matters, having only purchased one horse previously for which he hired a trainer to advise him on the purchase. Thus, he lacks equestrian expertise or sophistication in these matters.

57.   Plaintiff informed Defendants that he was seeking a horse suitable for horse show jumping competitions. Defendants failed to disclose to Mr. Trope that Finley was easily spooked and unsafe to ride – facts that Defendants knew.

58.   In addition, once Plaintiff's daughter started riding Finley under Defendant Reimer's training, and Finley showed signs of "spinning," Defendant Reimer should have informed Plaintiff Trope of the spinning. Defendant Reimer knew of Finley's deficiency, as confirmed by her phone call with Lisa Winn and Jessica Rabbiner in April 2024.

59.     Mr. Trope reasonably relied on Defendants' silence and omissions of
Finley's defects in purchasing Finley, considering Defendants' superior knowledge
and expertise and Mr. Trope's obvious inexperience.

60.     But for Defendants' fraudulent concealment, Mr. Trope would not
have purchased Finley nor suffered damages in excess of $250,000.

61.     Because Defendants' conduct is so outrageous, done with malicious
intent, and this type of conduct needs to be deterred in the future, punitive damages
of no less than three times Plaintiff's actual damages should also be awarded, in
the sum of not less than $750,000.

## THIRD CLAIM FOR RELIEF

### (Fraudulent Misrepresentation)

AS AND FOR A THIRD CLAIM FOR RELIEF FOR FRAUDULENT
MISREPRESENTATION AGAINST DEFENDANTS REIMER AND SHADY
TREE STABLES, LLC PLAINTIFF ALLEGES:

62.     Plaintiff realleges and incorporates by reference paragraphs 1 through
61 inclusive of Plaintiff's Complaint herein above with the same force and affect
as those set forth in full herein below.

63.     Defendant Reimer is an equestrian professional engaged in the
business of training horses. Mr. Trope is a novice in equestrian matters, having
only purchased one horse previously for which he hired a trainer to help purchase,
and lacks equestrian expertise.

64.     Defendant Reimer falsely represented that Plaintiff's daughter's first
horse Cappy was not capable of advancing Plaintiff's daughter in equestrian
activities, as Cappy went on to outperform what Reimer had claimed was possible.

65.     Defendant Reimer also falsely represented that Finley was a perfect
horse to replace Cappy and that Finley was an excellent show jumping horse
because Finley was not able to be ridden safely.

66.     In fact, Defendant Reimer knew that Finley was not fit for equestrian

PLAINTIFF'S INITIAL COMPLAINT

activities. Specifically, Reimer knew that Finley was easily spooked and not safe to ride, a material fact as Plaintiff Trope's purpose in buying a horse was for it to be used in show jumping.

67.    Defendant Reimer made these misrepresentations knowingly and with the intent to induce Plaintiff Trope to rely on them and enter into the Contract for Finley.

68.    Plaintiff Trope reasonably relied on these representations regarding Finley's suitability for equestrian use, considering Reimer's superior knowledge and expertise and Mr. Trope's inexperience.

69.    As a direct result of Defendant Reimer's fraudulent misrepresentation, Mr. Trope purchased Finley, causing Mr. Trope to suffer damages in excess of $250,000.

70.    Because Defendant Reimer's and Defendant Shady Tree's conduct is so outrageous, done with malicious intent, and this type of conduct needs to be deterred in the future, punitive damages of no less than three times Plaintiff's actual damages should also be awarded, in the sum of not less than $750,000.

**FOURTH CLAIM FOR RELIEF**

(Negligent Misrepresentation)

AS AND FOR A FOURTH CLAIM FOR RELIEF FOR NEGLIGENT MISREPRESENTATION AGAINST ALL DEFENDANTS, PLAINTIFF ALLEGES:

71.    Plaintiff realleges and incorporates by reference paragraphs 1 through 70 inclusive of Plaintiff's Complaint herein above with the same force and affect as those set forth in full herein below.

72.    Defendants Dorlag and Reimer are equestrian professionals engaged in the business of buying, selling, and training horses. Mr. Trope is a novice in equestrian matters, having only purchased one horse previously in which he hired a trainer to advise him on the purchase.  Furthermore, overall, he lacks equestrian

11

PLAINTIFF'S INITIAL COMPLAINT

expertise in evaluating the quality and appropriateness of horses.

73.    Plaintiff Trope informed Defendants that he was seeking a horse suitable for show jumping and reasonably relied on Defendants' superior expertise in evaluating an appropriate horse.

74.    A duty arose between Defendants and Plaintiff due to the disparity in knowledge and the roles of Defendants as professional sellers and the Plaintiff as a simple consumer – similar to the duty a car dealer owes to a prospective buyer who enters a car lot.

75.    As Plaintiff's daughter's horse trainer, Defendant Reimer had a duty to ensure that the horses she recommended for Raquel were appropriate and safe for show jumping, especially due to the dangerous nature of show jumping.

76.    In running a horse training school, Defendant Shady Tree had a duty to ensure that the horses ridden at its stables were safe and suitable for show jumping.

77.    Defendants Dorlag and Reimer breached these duties by representing that Finley was a perfect horse for Raquel. To the extent that they were unaware, they should have known that Finley was not suitable for show jumping.

78.    Based on the facts set forth herein above, Defendants clearly misrepresented Finley's suitability for equestrian events. Multiple experts watched Finley and observed that he was not safe to ride. Despite their equestrian expertise, Defendants failed to recognize or disclose Finley's unsuitability.

79.    Defendants were negligent in making these representations because they had no reasonable grounds for believing that their representations about Finley's suitability for horse show activities were true.

80.    Additionally, Defendant Reimer represented that Plaintiff's first horse, Cappy, would not be able to progress Plaintiff's daughter in her equestrian pursuits. In fact, Cappy subsequently outperformed Reimer's prior assessment of Cappy. Plaintiff's daughter went on to win multiple ribbons in numerous show jumping competitions riding Cappy.

PLAINTIFF'S INITIAL COMPLAINT

81.    To the extent that she did not know, Defendant Reimer should have
known that Plaintiff Trope was relying on her statements as to Cappy's alleged
deficiencies as she was Plaintiff's daughter's horse trainer and should have known
that Raquel and Plaintiff would be relying on her advice.

82.    Accordingly, Reimer had a duty to properly advise Plaintiff Trope
regarding Cappy's show jumping abilities.

83.    Reimer breached this duty when she negligently misrepresented
Cappy's lack of ability to progress in show jumping, despite her expertise and
familiarity with Cappy, and should have known Cappy's show jumping
capabilities were not yet fully maximized.

84.    Through these misrepresentations, Defendants intended to induce
Plaintiff Trope to purchase Finley.

85.    Plaintiff Trope reasonably relied upon Defendants' misrepresentations
given the expertise of Defendants and lack of knowledge of Plaintiff.

86.    As a result of Defendants' negligent misrepresentations, Plaintiff
Trope purchased a horse that was unsafe and unfit for equestrian activities,
unnecessarily replaced a capable horse, and suffered damages of at least $250,000.

**FIFTH CLAIM FOR RELIEF**

(Breach of Fiduciary Duty)

AS AND FOR A FIFTH CLAIM FOR RELIEF FOR BREACH OF
FIDUCIARY DUTY AGAINST DEFENDANTS REIMER AND SHADY TREE
STABLES, LLC PLAINTIFF ALLEGES:

87.    Plaintiff realleges and incorporates by reference paragraphs 1 through
86 inclusive of Plaintiff's Complaint herein above with the same force and affect
as those set forth in full herein below.

88.    Defendant Reimer is an equestrian professional engaged in the
business of buying, selling, and training horses. Mr. Trope is a novice in equestrian
matters, having only purchased one horse previously in which he hired a trainer to

PLAINTIFF'S INITIAL COMPLAINT

advise him on the purchase.  Furthermore, overall, he lacks equestrian expertise in evaluating the quality and appropriateness of horses.

89.    A fiduciary duty was created between Plaintiff Trope and Defendant Reimer when Mr. Trope hired Reimer to act as his agent in searching for a horse to purchase.

90.    This fiduciary duty was breached when Defendant Reimer recommended the purchase of Finley and falsely represented that Finley was perfect for Plaintiff's daughter's equestrian use, despite knowing that Finley was unsafe and unsuitable for riding.

91.    Defendant Reimer also failed to disclose material facts about Finley's behavioral issues, which were known or should have been known by an experienced equestrian professional such as Reimer.

92.    As a direct and proximate result of Reimer's breach of fiduciary duty, Plaintiff Trope suffered damages in excess of $250,000.

93.    Because Defendant Reimer's and Defendant Shady Tree's conduct is so outrageous, done with malicious intent, and this type of conduct needs to be deterred in the future, punitive damages of no less than three times Plaintiff's actual damages should also be awarded, in the sum of not less than $750,000.

## SIXTH CLAIM FOR RELIEF

(Breach of Warranties of Merchantability and Fitness for a Particular Purpose under Cal. Civ. Code §§ 1792-1792.2)

AS AND FOR A SIXTH CLAIM FOR RELIEF FOR BREACH OF THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AGAINST ALL DEFENDANTS, PLAINTIFF ALLEGES:

94.    Plaintiff realleges and incorporates by reference paragraphs 1 through 93 inclusive of Plaintiff's Complaint herein above with the same force and affect

14

as those set forth in full herein below.

95.     If the alleged contract is determined to be valid and binding, then Defendants Dorlag and Reimer breached the implied warranties of merchantability and fitness for a particular purpose under Cal. Civ. Code §§ 1792—1792.2.

96.     Defendants Dorlag, Reimer, and Shady Tree are merchants as they deal with the selling of horses. Mr. Trope is a novice in equestrian matters, having only purchased one horse previously in which he hired a trainer to advise him on the purchase.  Furthermore, overall, he lacks equestrian expertise in evaluating the quality and appropriateness of horses.

97.     Defendant Dorlag and Defendant Reimer, acting as an agent of Defendant Dorlag, breached the implied warranty of merchantability. At the time Finley was sold to Plaintiff Trope, Finley was defective because he was not safe to be ridden and was prone to spinning.

98.     Defendants Dorlag and Reimer breached the implied warranty of fitness for a particular purpose as Defendants knew that Plaintiff wanted a horse for the purpose of equestrian show jumping events and knew that Plaintiff was relying on Defendants' knowledge of Finley, yet sold Finley to Plaintiff while Finley was not able to be used for any intended purposes at equestrian events.

99.     Although the alleged Contract, attached here as Exhibit 1, contains an "as-is" clause disclaiming the implied warranties of merchantability and fitness for a particular purpose, the Contract also contains a merger clause which states that "The Agreement contains the entire agreement of the parties and any prior or concurrent written or oral understanding is deemed merged into this Agreement. The Agreement shall be binding upon the parties hereto, their heirs, personal representatives, successors and assigns."

100.     Because the language of the Contract does not exclude prior and contemporaneous understandings, Defendants' prior statements regarding Finley's fitness are relevant and became part of the Contract. Prior to the Contract being

PLAINTIFF'S INITIAL COMPLAINT

1   executed, Defendants Dorlag and Reimer made representations to Plaintiff Trope
2   that Finley was in good condition and suitable to be used for equestrian show
3   jumping events.

4       101.    But for these representations, Plaintiff would never have bought
5   Finley. Therefore, it is nonsensical that Plaintiff would buy a horse and waive the
6   very purpose for which the transaction took place, and so the waiver should be
7   deemed invalid.

8       102.    As a result of Defendants' breach of the implied warranties of
9   merchantability and fitness for a particular purpose, Plaintiff Trope has suffered
10  damages in the amount of $250,000, which represents the difference between the
11  value of the good as delivered and the value it would have been if it had been as
12  warranted.

### SEVENTH CLAIM FOR RELIEF

(Breach of Contract)

AS AND FOR A SEVENTH CLAIM FOR RELIEF FOR BREACH OF
CONTRACT AGAINST ALL DEFENDANTS, PLAINTIFF ALLEGES:

17      103.    Plaintiff realleges and incorporates by reference paragraphs 1 through
18  102 inclusive of Plaintiff's Complaint herein above with the same force and affect
19  as those set forth in full herein below.  The Contract between Plaintiff Trope and
20  Defendant Dorlag for the purchase of Finley is attached here as Exhibit 1.

21      104.    If the alleged Contract is determined to be valid and binding, then
22  Defendants Dorlag and Reimer breached the Contract.

23      105.    Defendants Dorlag and Reimer are equestrian professionals engaged in
24  the business of buying, selling, and training horses. Mr. Trope is a novice in
25  equestrian matters, having only purchased one horse previously in which he hired a
26  trainer to advise him on the purchase.  Furthermore, overall, he lacks equestrian
27  expertise in evaluating the quality and appropriateness of horses.

28      106.    The Contract states that "The Agreement contains the entire agreement

PLAINTIFF'S INITIAL COMPLAINT

of the parties and any prior or concurrent written or oral understanding is deemed merged into this Agreement. The Agreement shall be binding upon the parties hereto, their heirs, personal representatives, successors and assigns."

107.    The Agreement is also binding on Defendant Reimer because she acted as a representative of Defendant Dorlag during the Contract negotiations.

108.    Defendants Dorlag and Reimer made representations, prior to the Contract being executed, to Plaintiff Trope that Finley was in good condition and suitable to be used for equestrian events. Because the language of the Contract does not exclude prior and contemporaneous understandings, Defendants' prior statements regarding Finley's fitness are relevant and binding terms of the Contract.

109.    At the time Defendants Dorlag and Reimer made these representations to Plaintiff Trope and at the time of the signing of the Contract, these representations were false. Finley was neither in good health nor suitable to be used for equestrian show jumping events.

110.    Thus, Defendants Dorlag and Reimer materially breached the Contract for which Plaintiff Trope seeks damages of at least $250,000.

**EIGHTH CLAIM FOR RELIEF**

(Breach of the Covenant of Good Faith and Fair Dealing)

AS AND FOR AN EIGHTH CLAIM FOR RELIEF FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALL DEFENDANTS, PLAINTIFF ALLEGES:

111.    Plaintiff realleges and incorporates by reference paragraphs 1 through 110 inclusive of Plaintiff's Complaint herein above with the same force and affect as those set forth in full herein below.

112.    Under California and Florida law, all contracts have the implied covenant of Good Faith and Fair Dealing.

113.    Defendants Dorlag and Reimer are equestrian professionals engaged in

PLAINTIFF'S INITIAL COMPLAINT

1  the business of buying, selling, and training horses. Mr. Trope is a novice in

2  equestrian matters, having only purchased one horse previously in which he hired a

3  trainer to advise him on the purchase.  Furthermore, overall, he lacks equestrian

4  expertise in evaluating the quality and appropriateness of horses.

5      114.    Defendants Dorlag and Reimer knew that Finley was not in good

6  condition nor suitable for equestrian events yet made these false representations to

7  Plaintiff.  These representations were merged into the Contract.

8      115.    In the instant case, the Contract was breached and there was a lack of

9  Good Faith and Fair Dealings by Defendants. Thus, Plaintiff seeks damages of at

10  least $250,000 for the breach of the Covenant of Good Faith and Fair Dealing.

11                          **NINTH CLAIM FOR RELIEF**

12                              (Declaratory Relief)

13      AS AND FOR A NINTH CLAIM FOR DECLARATORY RELIEF

14  AGAINST ALL DEFENDANTS, PLAINTIFF ALLEGES:

15      116.    Plaintiff realleges and incorporates by reference paragraphs 1 through

16  115 inclusive of Plaintiff's Complaint herein above with the same force and affect

17  as those set forth in full herein below.

18      117.    A dispute has arisen concerning the Contract attached hereto and

19  described herein above.  Because Plaintiff is seeking the entire Contract be voided,

20  Plaintiff seeks a declaration that the entire Contract is null and void. However, if

21  the Contract or parts of it are found to be valid, Plaintiff seeks a declaration of all

22  his rights and remedies under the Contract, pursuant to the Federal Declaratory

23  Relief Act under 28 U.S.C §2201.

24                                  **PRAYER**

25      WHEREFORE, Plaintiff prays for relief against Defendants as follows:

26  **For the First Claim for Relief for Fraud in the Inducement against all**

27  **Defendants:**

28      1.    For special and general damages in at least the sum of Two Hundred

and Fifty Thousand Dollars ($250,000);

2.    For Attorney's fees and costs to the extent allowed at law;

3.    For punitive damages, no less than three times general damages, which translates into Plaintiff seeking a punitive damages award of no less than $750,000;

4.    That the Contract be declared null and void for fraud in the inducement;

5.    For such other and further relief that the court may grant;

**For the Second Claim for Relief for Fraudulent Concealment against all Defendants:**

1.    For special and general damages in at least the sum of Two Hundred and Fifty Thousand Dollars ($250,000);

2.    For Attorney's fees and costs to the extent allowed at law;

3.    For punitive damages, no less than three times general damages, which translates into Plaintiff seeking a punitive damages award of no less than $750,000;

4.    For such other and further relief that the court may grant;

**For the Third Claim for Relief for Fraudulent Misrepresentation against Defendants Reimer and Shady Tree:**

1.    For special and general damages in at least the sum of Two Hundred and Fifty Thousand Dollars ($250,000);

2.    For Attorney's fees and costs to the extent allowed at law;

3.    For punitive damages, no less than three times general damages, which translates into Plaintiff seeking a punitive damages award of no less than $750,000;

4.    For such other and further relief that the court may grant;

**For the Fourth Claim for Relief for Negligent Misrepresentation against all Defendants:**

PLAINTIFF'S INITIAL COMPLAINT

1.  For special and general damages in at least the sum of Two Hundred and Fifty Thousand Dollars ($250,000);

2.  For Attorney's fees and costs to the extent allowed at law;

3.  For punitive damages, no less than three times general damages, which translates into Plaintiff seeking a punitive damages award of no less than $750,000;

4.  For such other and further relief that the court may grant;

**For the Fifth Claim for Relief for Breach of Fiduciary Duty against Defendants Reimer and Shady Tree:**

1.  For special and general damages in at least the sum of Two Hundred and Fifty Thousand Dollars ($250,000);

2.  For Attorney's fees and costs to the extent allowed at law;

3.  For punitive damages, no less than three times general damages, which translates into Plaintiff seeking a punitive damages award of no less than $750,000;

4.  For such other and further relief that the court may grant;

**For the Sixth Claim for Relief for Breach of the Warranties of Merchantability and Fitness for a Particular Purpose against all Defendants:**

1.  For special and general damages in at least the sum of Two Hundred and Fifty Thousand Dollars ($250,000);

2.  For Attorney's fees and costs to the extent allowed at law;

3.  For such other and further relief that the court may grant;

**For the Seventh Claim for Relief for Breach of Contract against all Defendants:**

1.  For special and general damages in at least the sum of Two Hundred and Fifty Thousand Dollars ($250,000);

2.  For Attorney's fees and costs to the extent allowed at law;

3.  For such other and further relief that the court may grant;

PLAINTIFF'S INITIAL COMPLAINT

**For the Eighth Claim for Relief for Breach of the Implied Covenant of Good Faith and Fair Dealing against all Defendants:**

      1.     For special and general damages in at least the sum of Two Hundred and Fifty Thousand Dollars ($250,000);

      2.     For Attorney's fees and costs to the extent allowed at law;

      3.     For such other and further relief that the court may grant;

**For the Ninth Claim for Declaratory Relief against all Defendants:**

      1.     The Court declare the respective rights and duties of Plaintiff Trope and Defendants as to the alleged Contract;

      2.     That the entire Contract be declared null and void *ab initio*;

      3.     For Attorney's fees and costs to the extent allowed at law;

      4.     For such other and further relief that the court may grant.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues triable by a jury in the above-entitled action.

DATED: June 25, 2025             TROPE AND TROPE LAW GROUP

                                         Konrad L. Trope, Esq.

PLAINTIFF'S INITIAL COMPLAINT